IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | | |
|---|---|---|---|
| MAHMOOD GAZANI | § | | |
| *plaintiff* | § | | |
| | § | CA No. _____ | |
| vs. | § | | |
| | § | | |
| CITY OF HOUSTON | § | | |
| *defendants* | § | JURY TRIAL DEMANDED | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Comes now Plaintiff Mahmood Gazani ("Plaintiff" hereinafter or "Gazani") and files this his Original Petition complaining of the City of Houston, and in support thereof would show this Honorable Court as follows:

### I. PARTIES

1.    Plaintiff Mahmood Gazani is an individual residing in Harris County, Houston, Texas.

2.    Defendant City of Houston("HTX") is a municipality situated in Harris County, Texas, in the U.S. Southern District of Texas, and can be served through the City Secretary located at 901 Bagby Houston, Texas 77002.

3.    Defendant may also be served through its counsel of record, City of Houston Legal Department, P.O. BOX 368, Houston, Texas 77001-0368.

### II. JURISDICTION & VENUE

4.    Jurisdiction is proper pursuant to Texas Labor Code §§21.000 et seq.. All jurisdictional prerequisites and conditions precedent, pursuant to TRCP Rule 54, have been met. Defendant CITY OF HOUSTON qualifies as an "employer" under §21.002(8)(a) of the Texas Labor Code. Venue and Jurisdiction are also proper in this district under 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claim occurred in this District.

5.     Venue is proper in Harris County, Texas because it is the county in which all or a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred pursuant to Tex. Civ. Prac. & Rem. Code §15.002(a)(1), Harris is the County in which the Plaintiff resides, and the Defendant, City of Houston, as a municipality is partially located within Harris County, in the State of Texas. (Tex. Civ. Prac. Rem. Code §15.002(a)(3)). This cause also arises under Federal Question, pursuant 42 USC 2000e.

## III. EXHAUSTION OF ADMINISTRATIVE REMEDY

6.     Pursuant to the language of 42 U.S.C. § 1981 et seq, there is no administrative filing requirement with any agency under the purview of the United States government, hence no requirement to be met prior to bringing a claim, under this statute, in a court of competent jurisdiction.

7.     Pursuant to 28 U.S.C. § 1658(a), there is a four (4) year statute of limitations on any claim brought under 42 U.S.C. § 1981.  As the incident made the crux of this case occurred on or about June 15th, 2019, Plaintiff affirms that cause is brought within the statute of limitations.

8.     Mr. Williams exhausted his administrative remedies pursuant to the requirements of 42 U.S.C. § 2000e *et seq*, and has taken all steps necessary to bring the causes of action made the subject of this litigation.

9.     On or about **April 21st , 2021**, Mr. Gazani filed his amended FORM 5 Charge of Discrimination with the Equal Employment Opportunity Commission. [ **Plaintiff's Exhibit A** ]  Designated by Charge Number **460-2022-01060**, the charge clearly outlines claims for Discrimination and Retaliation based on the Claimant's age.

10.    Officer Gazani had initially filed his complaint in a time frame reaching back to February 15th, 2015, with his latest concern of adverse action dated to August 23rd, 2021 – and marked his concerns as a "Continuing Action" as the discrimination and retaliation against him were

on-going as of the date of his initial submission, as well as the date of the amendment to the charge.

11.    On or about **April 26th, 2022**, Mr. Gazani received a Dismissal and Notice of Rights Letter [ **Plaintiff's Exhibit B & C** ] by the Equal Employment Opportunity Commission. This letter qualifies Ms. Gazani's right to initiate litigation, giving an operational window of ninety (90) days from the above date.

12.    "Authorization to the aggrieved person to bring a civil action under title VII, the ADA, or GINA pursuant to section 706(f)(1) of title VII, section 107 of the ADA, or section 207 of GINA within 90 days from *receipt* of such authorization..." see 29 CFR §1601.28 (e)(1) (emphasis added)

## IV. FACTUAL ALLEGATIONS

13.    On or about February 2, 2015, Mahmood Gazani was hired to work for the Houston Police Department as a Police Officer. Officer Gazani was qualified for the position. To present date, Officer Gazani maintains an exemplary work history with the Houston Police Department.

14.    On or about August 15, 2021, Officer Gazani was unable to turn in his Probationary Police Officer (herein after referred to as PPO) paperwork due to some personal issues. Officer Gazani notified Sergeant Miller that he was unable to complete his paperwork for that day to which Sergeant Miller responded that Officer Gazani was "Fucking with his money."  Officer Gazani began working on the paperwork around 2330 hours and reported to Sergeant Miller of its completion.

15.    After the incident with Sergeant Miller, Officer Gazani brought up that it was not feasible to have PPOs read and sign paperwork in the late hours of the evening when they were not on duty.  Sergeant Miller disagreed and stated that the department demanded the

paperwork to be signed as a condition of employment and the PPO were not to be compensated for working off the clock.

16.     On or about August 16th, 2021, Officer Gazani received a phone call from Sergeant Miller requesting PPOs to issue citations on traffic stops instead of giving warnings as Sergeant Miller did not believe it "served a purpose to stop and give warnings."

17.     Officer Gazani discussed with Sergeant Miller that he felt as though Sergeant Miller was setting up a quota for traffic stops. (A practice which he believed to be illegal.)  Officer Gazani did not feel as though minor traffic violations, such as single moving or non-moving violations, required citations.  Sergeant Miller told Officer Gazani that moving violations must be written and for every three traffic stops, Sergeant Miller expected one or two citations to be given.  (Another practice which Mr. Gazani believed to be illegal.)

18.     Sergeant Miller also insisted that PPOs did not have discretion when it came to traffic stops during the Evaluation Phase as PPOs were not full pledge officers yet due to their probationary status.  Officer Gazani disagreed with this statement and stated that PPOs are full pledge officers as they had been sworn in upon completion of their training in the Police Academy and therefore would be regulated by the same rules and have the same rights as any other police officer.

19.     Officer Gazani also suggested other solutions such as having copies of citations with no citation numbers on them for the PPOs who did not see it necessary to issue a citation during a traffic stop.  The purpose of this was to still give the PPOs the necessary field training needed during their Evaluation Phase.  Sergeant Miller immediately declined the suggestion and Officer Gazani and Sergeant Miller agreed to take the matter to Lieutenant Sulla to discuss the matter further.

20.     On or about August 20, 2021, PPO Covert reported to Officer Gazani that he was
        approached by Sergeant Miller after roll call the day before and informed that he did not
        have discretion during the Evaluation Phase and PPO Covert was expected to issue
        citations for all traffic stops.  Officer Gazani approached the acting Lieutenant on evening
        shift, Sergeant Casterenvancatenburch, and explained that he was concerned about being
        in violation of the State Law for setting a **quota** for citations with officers.

21.     On or about 1540 hours, Sergeant Miller sent a text message to Officer Gazani stating
        that he was upset about Officer Gazani taking his concerns of being in violation of the
        State Law to another supervisor.  Sergeant Miller stated that they were to take the issue to
        Lieutenant Sulla.  Sergeant Miller failed to acknowledge that agreement when Sergeant
        Miller approached PPO Covert to inform him that he no longer had discretion during
        traffic stops.  Officer Gazani requested to speak to Lieutenant Sulla however was
        informed by Sergeant Miller that Lieutenant Sulla would not be at work that evening.

22.     Officer Gazani was asked later the same day by acting Lieutenant, Sergeant
        Casterenvancatenburch, to meet him at the station after calling out to eat.  As Officer
        Gazani approached Sergeant Casterenvancatenburch's office, Sergeant Miller who was
        inside, yelled at Officer Gazani to stand by outside.  Moments later, Officer Gazani was
        asked to walk to the back of the station where Sergeant Miller's office was.  Officer
        Gazani entered the office with Sergeant Miller and Sergeant Casterenvancatenburch.

23.     Sergeant Casterenvancatenburch agreed with Officer Gazani that PPOs were full pledged
        officers as they were sworn in by the academy and their PPO status did not remove their
        right to discretion during traffic stops.  Sergeant Miller disagreed with Officer Gazani and
        Sergeant Casterenvancatenburch and held his opinion that PPOs did not have discretion.
        Sergeant Miller also did not recall approaching PPO Covert at all to inform him of the

fact that he did not have discretion as a PPO.  The meeting ended with the agreement to present that matter to Lieutenant Sulla.

24.    On or about August 21st, 2021, Officer Gazani met with Lieutenant Sulla, Sergeant Miller, and acting commander Lieutenant Nguyen.  During the meeting, Officer Gazani presented a hard copy of: TRANSPORTATION CODE, TITLE 7. VEHICLES AND TRAFFIC, SUBTITLE I.  ENFORCEMENT OF TRAFFIC LAWS, CHAPTER 720. MISCELLANEOUS PROVISIONS.

25.    Officer Gazani explained that he swore to adhere to the laws and how he takes every step to consider the citizens he has sworn to protect.  Officer Gazani provided many examples of discretion that he has utilized throughout his years of employment through the Houston Police Department as a patrolman, trainer, and evaluator.  Officer Gazani also used personal examples from his experience with the Iranian Government, the government who took power over Iran which is the country Officer Gazani was born and raised in. He explained that the Iranian Government had lost the public's trust by being careless and inconsiderate when dealing with the nation's citizens.  Officer Gazani explained that what he experienced in that country is the reason why he always considers the citizens favor while conducting police work.

26.    Leiutenant Sulla responded, "This is not your country and we run things differently here." Lieutenant Sulla and Sergeant Miller disagreed with Officer Gazani's point of view and presented multiple areas in the department policy that Officer Gazani's opinions did not provide a clear resolution to the issue at hand.

27.    Later in the meeting, Sergeant Miller presented the suggestion of providing copies of citations to PPOs to fill out.  Sergeant Miller stated a night shift supervisor had presented the idea him and thought it was genius.  He stated that if Officer Gazani has presented the same suggestion, he would have accepted it.  Officer Gazani had presented the idea to

Sergeant Miller on or about August 16th, 2021.

28.   Officer Gazani took this meeting as an opportunity to openly discuss Sergeant Miller's

hostility towards him causing Officer Gazani to feel threatened and disregarded.  Officer

Gazani was informed that he could take the matter to the Internal Affairs Department

(hereafter referred to IAD).  Officer Gazani was informed that if he chose to take the

matter to IAD, that the officials present in the current meeting would have to write letters

to which they did not care as they had written many letters before.

29.   Lieutenant Sulla then stated that if Officer Gazani decided to go to IAD that he would be

reported as being in violation of the department policy for being insubordinate as well as

a few other violations of the department policy.

30.   Officer Gazani stated his intention was not to get anyone in trouble and just wanted to

follow department policy and get legal advice from legal professionals.  Lieutenant

Nguyen asked at the end of the meeting what Officer Gazani was requesting which

Officer Gazani responded that he wanted legal clarification regarding discretion to the

officers.  Lieutenant Nguyen permitted Officer Gazani to write a letter requesting legal

clarification on the issue at hand.

31.   Days later, Officer Gazani crafted and titled a letter "Legal Advice Request" and

submitted the draft letter via email to Sergeant Miller (Reference to G.O. GO 200-3 P2, 2,

300-11 P5 Section 4, 300-11 P7 section 6. for violations of department policy).

32.   On or about August 23rd, 2021, Officer Gazani resigned from his position as a Field

Training Officer within the Field Training Office via email to Sergeant Miller.  Sergeant

Miller accepted Officer Gazani's resignation and forwarded it through the chain of

command to include Lieutenant Barber.

33.     That same day, Sergeant Miller informed Officer Gazani that he needed to meet with his shift Lieutenant, Lieutenant Barber.  Lieutenant Barber informed Officer Gazani that the meeting would include Sergeant Miller and Command Nguyen in order for Officer Gazani to not feel as though he was being interrogated.

34.     During the meeting, the issue of PPO having discretion was discussed in great length. Lieutenant Barber told Officer Gazani it was not Officer Gazani's business to be concerned with citizen's financial hardship and per Commander Nguyen, all officers were expected to issue citations on traffic stops, specifically moving violations.  The issue of Sergeant Miller removing discretion from PPO Covert was revisited and Sergeant Miller denied his statement about not speaking with PPO Covert but admitted to speaking with him on or about August 19th, 2021 after roll call.

35.     During this meeting, Commander Nguyen permitted Officer Gazani to write and submit a letter asking for legal clarification, but it had to be through the Houston Police Academy and not the Internal Affairs Department.  Officer Gazani was later notified by Sergeant Miller that Officer Gazani was to use the chain of command submitting the printed letter. The letter was to go through Sergeant Miller, Lieutenant Sulla. Commander Nguyen and then to the Commander of training.

36.     On or about August 30th, 2021, Officer Gazani submitted the signed printed letter to Sergeant Miller.  Sergeant Miller informed Officer Gazani that he needed to change the title of his letter as well as the wording.  Officer Gazani respectfully declined to change anything and reminded Sergeant Miiller that the title was already approved through Commander Nguyen.  Seargeant Miller agreed to accept Officer Gazani's letter, so Officer Gazani reprinted and resubmitted the letter that same day.  (Reference to G.O. 300-11 P4 for violations of department policy.)

GAZANI - Original Complaint                                            Page 8 of  26

37.    On or about August 31st, 2021, Officer Gazani received an email from Sergeant Miller stating that Officer Gazani's letter was submitted to Lieutenant Sulla – however, Lieutenant Sulla was not willing to sign the letter due to the wording of the letter, insinuating that Officer Gazani had been given an Unlawful Order.  Sergeant Miller implied that Officer Gazani needed to change the title of his letter from Legal Clarification to Clarification of Policy and Not Legal Opinion.  (Reference to GO 300-11 P5 for violation of department policy).

38.    On or about September 6th, 2021, Officer Gazani was contacted by Representative Officer Spjut (Officer Spjut was a previous trainee of Officer Gazani) regarding a rumor that was going around the station.  Officer Spjut had been contacted by Officer Kuccia regarding Officer Gazani.  Officer Kuccia had been informed from Sergeant Miller that Officer Gazani was no longer allowed to train PPO's *due to being in trouble with IAD*. (Reference to G.O. 300-11 P7 Section 6, 300-11 P9, 300-11 P9 Section 8, 300-11 P10 for department policy violations.)

39.    On or about September 9th, 2021, Officer Gazani approached Lieutenant Barber about the best way to dissolve the rumors going around the station.  Lieutenant Barber stated that you cannot stop officers from spreading rumors.  Officer Gazani asked permission from Lieutenant Barber to request that Sergeant Miller either serve Officer Gazani with his 48-hour notice per the departments policy – if he was in trouble with IAD – or publicly announce that Officer Gazani had resigned from his position as Field Trainer and Evaluator.  Lieutenant Barber declined Officer Gazani's request.  (Reference to G.O. 300-11 P4 for violation of policy)

40.    On or about September 10th, 2021, Officer Gazani went to the Houston Police Department Headquarters at 1200 Travis St., Houston, Texas to file a complaint.  Officer Gazani spoke to Sergeant Milligan about the large amount of issues Officer Gazani had

been facing in the station and Sergeant Milligan suggested that ADR would be a better

approach to resolving the issues Officer Gazani was experiencing.  Sergeant Milligan

stated that there was a chance the complaint may be sent back to IAD at some point.

41.     That same day, Officer Gazani spoke with ADR staff and completed an Issue Resolution

record form.  This form was submitted through the proper channels.  Officer Gazani was

informed that Commander Nguyen should reach out to Officer Gazani in a few days as

this was the last chance to have the legal clarification request to be submitted through the

chain of command at the Northwest Station.

42.     On or about October 18th, 2021, Lieutenant Barber asked Officer Gazani if the ETC issue

had been resolved and if Officer Gazani had followed the Commander's orders and

submitted the letter through the chain of command to the Commander of the Houston

Police Department Academy.  Officer Gazani explained that he had attempted however

his attempts were obstructed via Sergeant Miller and Lieutenant Sulla requesting for

Officer Gazani to change the title of his letter to Clarification of Policy and Not Legal

advice, change the format of the quoted law, and the content of the letter to not insinuate

that Officer Gazani had been given an Unlawful Order.

43.     Officer Gazani explained to Lieutenant Barber that he respectfully declined to change his

letter in any sense as it was his right to ask the question in the way he presented it.

Lieutenant Barber ordered Officer Gazani to only change the formatting of the quoted law

and to leave the letter in Lieutenant Barber's office mailbox.  Officer Gazani followed

instructions and left the letter within Lieutenant Barber's mailbox signed and dated the

same day.  (Reference to G.O. 300-26 P3, 300-11 P10 for violations of department

policy)

44.     On or about November 17th, 2021, Officer Spjut contacted Officer Gazani to provide

Officer Gazani and update on the ADR/ERC process.  Officer Spjut explained that he had

a meeting with the higher-ups within the chain of command to include the Chief of Police
as well as Commander Nguyen, Lieutenant Nguyen, and Sergeant Singleton.  Lieutenant
Nguyen and Sergeant Singleton were administrative staff at the Northwest Station.

45.     Prior to the meeting, Sergeant Singleton asked Officer Spjut if he was planning on
addressing Officer Gazani's ADR issue with the Police Chief.  Officer Spjut responded
that he was not planning on discussing Officer Gazani's issue during the meeting because
no resolution was achieved thus far, and that Assistant Chief Bashir was working on the
matter.  Officer Spjut also stated he had spoken with the Assistant Chief Bashir after the
meeting and understood that they were pending a response from him within a few days
for the ADR paperwork Officer Gazani had submitted.

46.     Officer Spjut also stated that Sergeant Singleton in the presence of Lieutenant Nguyen
stated that Officer Spjut should just tell the Chief of Police that Officer Gazani was lying,
and Sergeant Miller would never make such a statement in regard to removing discretion
from officers and potentially setting up a quota system for traffic citations.  (Reference to
G.O. 300-26 P2, 300-11 P4, 300-11 P5 Section 4, 300-11 P7 Section 6. 300-11 P9,
300-11 P9 Section 8, 300-11 P10 for violations of department policy.)

47.     On or about November 19th, 2021, Officer Gazani drove back to the Houston Police
Headquarters and spoke to Sergeant Segura regarding the meeting Officer Spjut had just
had with the higher-ups.  Officer Gazani became fearful that an uninvolved member of
his chain of command could try and dilute the Assistant Chief of Police's decision
regarding Officer Gazani's request for legal clarification.  Officer Gazani in detail
explained the events that had transpired at the Northwest Station to Sergeant Segura.
Sergeant Segura instructed Officer Gazani to leave for the day and write a detailed
statement of events and reach back out to him if Officer Gazani had not heard back from
Sergeant Segura regarding the next steps in the process.  Officer Gazani left the

headquarters and went to work.  (Reference to G.O. 200-3 P4, 300-11 P9, 300-11 P9

Section 8, 300-11 P10 for violations of department policy).

48.    On or about December 12th, 2021, Officer Gazani received correspondence from Officer

Spjut that included a one-page letter from Assistant Chief of Police Bashir that included

statements that Officer Gazani did not contain clear legal clarification on Officer Gazani's

concerns.  Officer Gazani requested that Officer Spjut to reach out to Gary Gano and

follow proper procedures for getting a proper and clear response.  Mr. Gano denied the

request and responded, "The department has responded to the employee's issue as the

ERC process requires and the issue has been closed."  Officer Gazani was then referred to

the Union and COP.  (Reference to G.O. 300-12 Page 4 for violation of policy).

49.    On or about December 21st, 2021, Officer Gazani was on vacation.  During his vacation,

Officer Gazani had received a request for a zoom call with the Harris County District

Attorney regarding a Capital Murder case.  Officer Gazani was on the zoom call for

approximately an hour.  Officer Gazani reached out to Sergeant Tudyk to be compensated

for the hour he spent speaking with the Assistant District Attorney.  Sergeant Tudyk

stated that Officer Gazani would not be compensated for speaking to the Assistant

District Attorney about a case.

50.    On or about December 31st, 2021, Officer Gazani took his second COVID-19 booster

shot that was highly suggested throughout the city of Houston.  After the booster, Officer

Gazani started feeling minor symptoms and as a result, Officer Gazani called out of work

to treat the symptoms and prevent a possible incident at work.  Sergeant A. Miller was the

desk supervisor that night.  Sergeant Miller became upset with Officer Gazani and stated

Lieutenant Barber expected everyone to come to work and Officer Gazani calling out of

work left only 1 unit on early side in District 4.  A few days later, Officer Gazani's

symptoms became worse, and he tested himself for COVID-19.  The result of Officer

Gazani's test was positive, and Officer Gazani was forced to take more time off.  It was until later that Officer Gazani realized that the time off, he had taken had been marked down as an *unscheduled absence* and **not** as COVID-19 related medical leave.

51.    On or about February 18th, 2022, Officer Gazani met with Commander Nguyen and Lieutenant Barber to discuss a pending IAD investigation that was *against* Officer Gazani.  Officer Gazani was informed that he was being cited for two violations that Officer Gazani did not believe applied to him given the circumstances of the situation. Sergeant Terry had spoke to Officer Gazani previously about getting HIPAA releases at hospitals regardless of circumstances.  An incident occurred at the hospital for Officer Gazani following direct orders from his Sergeant.  Officer Gazani explained that he had already been coached on location of the hospital the date of the incident by the Lieutenant that arrived on scene.  Officer Gazani later received notice by the station IAD that a formal complaint was filed against him.  Officer Gazani explained that even though he was following direct orders, the treatment and violations he was incurring was unfair. Commander Nguyen stated that the IAD issue was not serious and it was being forwarded for a committee review.

52.    Later that same day as a result from the IAD investigation, Officer Gazani was informed by Sergeant Terry that he was being ordered to lower Officer Gazani's bi-monthly employee evaluation points **from** five-out-of-five **to** two-out-of-five in professionalism. Officer Gazani requested a copy of the evaluation and did **not** receive it.

53.    Sergeant Terry informed Officer Gazani that the pending IAD investigation against Officer Gazani had been concluded and that was why he was being forced to reduce the evaluation points.  Officer Gazani informed Sergeant Terry that based on Officer Gazani's prior meeting with Commander Nguyen and Lieutenant Barber, that the disciplinary

decision was not final and was being sent to a review board for a final decision. Sergeant Terry stated that he had **never** watched Officer Gazani's body cam footage of the incident at the hospital and he believed Officer Gazani was a great officer; but that he, however, "had no choice " than to grade Officer Gazani below acceptable <u>from direct orders from Lieutenant Barber</u>.

54. Sergeant Terry also admitted to Officer Gazani that the higher-ups were upset with Officer Gazani due to the previous issue he had with Sergeant Miller and it was likely the higher-ups were getting back at Officer Gazani. Sergeant Terry also stated to Officer Gazani that he was afraid that if he did not follow direct orders he would be disciplined for insubordination. Sergeant Terry stated all this in front of Officer Gazani's partner, Officer Tran.

55. On or about March 17th, 2022, Officer Gazani and his partner Officer Tran on-viewed a traffic hazard that involved a DWI driver outside the district but within the city limits. Sergeant Jurecek was informed of the event and Officer Gazani and Officer Tran requested paid overtime for the DWI processing. Sergeant Jurecek attempted to find another unit to take over the call but was unable to locate another unit. Sergeant Jurecek approved the paid overtime for Officer Gazani and Officer Tran. During the transport to JPC Intox, Sergeant Tudyk called Officer Tran and ordered him to re-route and get himself dropped off at the Northwest Substation sign off and leave the DWI to be processed by Officer Gazani.

56. Officer Gazani and Officer Tran followed the order and rerouted away from the JPC and towards the Substation. Officer Gazani contacted Watch command and requested to speak to a Lieutenant level supervisor following department policy and an order previously received from Lieutenant Barber regarding a previous similar situation. Sergeant Cordona with Watch command listened to Officer Gazani's concern about

processing a DWI by himself and ordered Officer Gazani and Officer Tran to re-route

back to JPC as a two-man unit.  Officer Gazani notified Sergeant Tudyk of the events and

was ordered to document information in an offense report.

57.     On or about April 7th, 2022, Officer Gazani received multiple notices from Sergeant

Adams to contact Executive Chief's Secretary as soon as possible to schedule a meeting.

Officer Gazani contacted the number provided and scheduled a meeting with the office of

Executive Assistant Chief Satterwhite on April 14th, 2022, at 1430 hours.

58.     During the meeting with the Chief, Officer Gazani realized that the Chief had not

properly been informed of Officer Gazani's issues with Sergeant Miller regarding

removing discretion from officers and potentially setting up a quota for traffic violations.

Officer Gazani took this opportunity to inform the Chief of what had happened and his

concerns with Sergeant Miller and the steps Officer Gazani had taken to get Legal

Clarification.  After listening to Officer Gazani, Chief Satterwhite ordered Officer Gazani

to meet with the commander of IAD.

59.     On or about April 14th, 2022, Officer Gazani sent a letter to Troy Finner, the Chief of

Police, with the subject line stating, "Complaint of Discrimination".  Within this letter,

Officer Gazani reported department policy violations by Assistant Chief Bashir,

Commander Nguyen, Lieutenant Nguyen, Lieutenant Sulla, Lieutenant Barber, Sergeant

A. Miller, and Sergeant Singleton.  The letter contained a detailed time-line of events

from Officer Gazani in regard to what has transpired during Officer Gazani's request for

legal clarification regarding officers not having discretion and a potential quota for traffic

violations.

60.     On or about April 19th, 2022, Officer Gazani received an **Order of No Contact** from

Assistant Chief Hatcher.   The order states that Officer Gazani "is to have no contact with

Assistant Chief Bashir, Commander Nguyen, Lieutenant Nguyen, Lieutenant Sulla, Lieutenant Barber, Sergeant A. Miller, and Sergeant Singleton."  Officer Gazani is ordered to have no contact, or be within vicinity of any of the named individuals in the No Contact Order *regardless* of Officer Gazani's duty status.

61.    On or about April 20th, 2022, Officer Gazani received a notice from Troy Finner, the Chief of Police.  The letter contained a notice of a three-day suspension in accordance with the provisions of the TEX. LOC. GOV'T CODE, CAPTER 143.  Officer Gazani's suspension was to start May 19th, 2022, and end May 21st, 2022.  The notice states that Officer Gazani was "rude to hospital staff and was also argumentative."  The notice states that it was determined that Officer Gazani violated Rules of the Civil Service Commision, to wit: Rule V, Section 6, Subsections 9b) and (k), Internal Directives, Order No. 100-01 and Order No. 200-08, also Access to Memorial Herman System Facilities, Circular No. 18-0510-061.  Officer Gazani had the right to appeal the determination within 15 days of receipt of the notice of suspension.  The notice explained the process to appeal.

62.    To present date, it is unknown if Assistant Chief Hatcher, or Chief Finner, have even viewed Officer Gazani's body-cam footage of the incident in question at Memorial Hermann.

63.    On or about April 21st, 2022, Officer Gazani filed with the EEOC claiming that he was being retaliated against for engaging in protected activities and being discriminated against due to his national origin.

64.    On or about April 25th, 2022, Officer Gazani's EEOC claim had been concluded and Officer Gazani was awarded a right to letter which Officer Gazani received April 26th, 2022.

## V.  CAUSES OF ACTION

### A.    RACIAL DISCRIMINATION UNDER  42 U.S.C. § 1981

65.    Plaintiff hereby adopts all factual allegations above *in haec verba*.

66.     Section 1981 prohibits individuals, including other employees, from racial discrimination against an employee. See  *Cardenas v. Massey*,  269 F.3d 251, 268 (3d Cir. 2001) ("Although claims against individual supervisors are not permitted under Title VII, this court has found individual liability under § 1981 when [the defendants] intentionally cause an infringement of rights protected by Section 1981, regardless of whether the [employer] may also be held liable."); *Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3d Cir. 1986) ("employees of a corporation may become personally liable when they intentionally cause an infringement of rights protected by Section 1981, regardless of whether the corporation may also be held liable")**.**

67.    Section 1981 prohibits race discrimination & retaliation, which includes Arab Americans within that ambit.  For purposes of Section 1981, Arabic is a "race".  *See Jatoi v. Hurst-Euless Bedford Hosp. Authority*, 807 F.2d 1214, 1218 (5th Cir. 1987); *Banker v. Time Chem., Inc.*, 579 F. Supp. 1183, 1186 (N.D. Ill. 1983).

68.    In the absence of direct evidence of discrimination, Section 1981 cases are governed by the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) (noting that Section 1981 claims and Title VII claims use the same burdens of proof and analysis.)

69.    First, the plaintiff must establish a *prima facie* case of discrimination, "which requires a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the

position at issue; (3) was discharged or suffered some adverse employment action by the

employer; and (4) was replaced by someone outside his protected group or was treated

less favorably than other similarly situated employees outside the protected group."

*McCoy*, 492 F.3d at 556; *Caldwell v. Univ. of Houston Sys.*, 520 Fed. Appx. 289, 293

(5th Cir. 2013); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000).

70.    If the plaintiff makes a *prima facie* showing of discrimination, the employer must then

provide a legitimate, non-discriminatory reason for the employment action. *Byers*, 209

F.3d at 425. "The burden on the employer at this stage is one of production, not

persuasion; it can involve no credibility assessment." *Alvarado v. Tex. Rangers*, 492 F.3d

605, 611 (5th Cir. 2007) (quotations and citations omitted).

71.    If the employer provides a legitimate, non-discriminatory reason, "the burden shifts back

to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is

instead a pretext for discrimination; or (2) that the employer's reason, while true, is not

the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected

characteristic." *Id*. (citation omitted). "Although intermediate evidentiary burdens shift

back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact

that the defendant intentionally discriminated against the plaintiff remains at all times

with the plaintiff.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000)

(quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 249 (1981)).

## B.    NATIONAL ORIGIN DISCRIMINATION UNDER TITLE VII

72.    Plaintiff hereby adopts all factual allegations above *in haec verba*.

73.    A claim of intentional discrimination may be proved by either direct

or circumstantial evidence. See *Wallace v. Methodist Hosp. Sys*. 271 F.3d 212, 219 (5th

Cir. 2001).  In cases of circumstantial evidence, courts usually follow the burden shifting

analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), for indirect discrimination claims. See *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005).

74.    To establish a *prima facie* case of discrimination, a plaintiff must establish he: (1) is a member of a protected class; (2) was qualified for the position at issue; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or other similarly situated persons were treated more favorably.  *McCoy*, 492 F.3d at 556; *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).

75.    In the instant case, Plaintiff is prepared to show that he (1) is a member of the class (Iranian/Arabic) who is intended to be protected by the statute; (2) was qualified for the position at issue, an irrefutable fact as he was vetted and hired by the Defendant; (3) was subject to adverse employment action, in the form of constant harassment by his managers at every level, the creation of a hostile work environment, and her ultimate unsubstantiated demotion based on false allegations, prior to the completion of an investigation by the state of Texas/IAD, as was orchestrated by his employer; and (4) other similarly situated persons were treated more favorably.

### C.    RETALIATION UNDER TITLE VII

76.    Plaintiff hereby adopts all factual allegations above *in haec verba*.

77.    Specifically, Plaintiff would reference the temporal proximity of the sequential submission of his complaint of racist behavior to his managers and supervisors, their ***multiple*** meetings with Mr. Gazani wherein his supervisors attempted to dissuade him from filing complaints of any kind – couched with both direct and veiled threats of

termination, and Mr. Gazani' subsequent write-ups within the following days. [1]

78.   Plaintiff restates the findings in *Cardenas* 269 F.3d 251 above, and reiterates his prior contention that 1981 claims and Title VII claims are examined under the same lenses pursuant to *Shackleford*, and as such, would assert that a cause for retaliation under 1981 falls under the same burdens as a cause for retaliation under Title VII. Hence, no alteration should be required in its prosecution. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) (noting that Section 1981 claims and Title VII claims use the same burdens of proof and analysis.)

79.   Plaintiff would again seek to bring this charge of Retaliation against his managers individually, as they acted directly in bringing about the intentional infringement of his rights which were protected under 42 U.S.C. 1981. [2]

80.   To successfully bring a claim of retaliation, the complainant must generally establish that 1) he or she **engaged** in activity protected by the statute; 2) that the employer took an **adverse employment action** against him or her; and 3) a **causal connection** exists between the protected activity and the adverse employment action. (Emphasis added) *Gee* v. *Principi*, 289 F.3d 342, 345 (5th Cir. 2002)(Title VII); *Davis* v. *Dallas Area Rapid Transit*, 383 F.3d 309 (5thCir. 2004)(retaliation under 42 U.S.C. §1981); *Hernandez* v. *Crawford Building Material Co.*, 321 F.3d 528 (5th Cir. 2003)(ADEA); 42 U.S.C. §12203(a), (b) (Americans with Disabilities Act).

---

[1] The amount of **time** between an employee's protected activity and the adverse employment action is "part of the analysis" with respect to whether an employee can establish the necessary causal connection. *Gee*, 289 F.3d 346 n.3 (quoting *Shirley* v. *Chrysler First, Inc*., 970 F.2d 39, 44 (5th Cir. 1992)). Timing can be a relevant factor in determining whether a causal connection exists where the timing is "suspiciously proximate." *Fabela*, 329 F.3d 417 n.9.

[2] See *Cardenas v. Massey*, 269 F.3d 251, 268 (3d Cir. 2001); *Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3d Cir. 1986)

81.   **ENGAGEMENT**.  The Fifth Circuit defines protected activity as "opposition to

any practice rendered unlawful by Title VII, including making a charge, testifying,

assisting or participating in any investigation, proceeding or hearing under

Title VII." *Ackel* v. *Nat'l Communs., Inc*., 339 F.2d 376, 385 (5thCir. 2003).

More simply, "Title VII prohibits an employer from retaliating against an employee

because that employee has complained about acts of discrimination at work."

*Manning* v. *Chevron Chem. Co.,LLC*, 332 F.3d 874 (5th Cir. 2003).

82.   An employee's use of an employer's internal administrative process to file an

employment discrimination complaint is "clearly protected activity" for purposes of a

retaliation claim.   *Fierros* v. *Tex. Dep't of Health*, 274 F.3d 187, 194 (5th Cir. 2001).

83.   Moreover, a plaintiff is not required to establish an actual violation of Title VII (or

1981) to invoke the protections of the anti-retaliation provisions. Rather, a plaintiff

only needs show that a charge was made, a complaint was submitted, or that

participation in investigation of a claim occurred. *Green* v. *Administrators of

Tulane Educational Fund*, 284 F.3d 642, 657 (5th Cir. 2002).   (A plaintiff's

reasonable belief that she was in the process of being terminated because of her

gender and made a complaint is sufficient for a retaliation claim.) *Id.*

84.   **ADVERSE ACTION**. Although the Fifth Circuit generally applies Title VII

holdings to claims brought under §1981, the definition of adverse employment

decision is broader under §1981.   Under §1981, reprimands, disciplinary filings

and transfers that are "equivalent to demotions" may be considered adverse

employment actions.   *Banks*, 320 F.3d at 580; *Erves*, 2004 WL 904122.  Plaintiff would

allege that his termination qualifies as an "adverse action".

85.     **CAUSAL CONNECTION**.  The final element of a plaintiff's prima facie case requires a plaintiff to establish a causal connection between his or her protected activity and the adverse employment action suffered.   This causal link "need not rise to the level of a 'but for' standard.'"  *Gee*, 289 F.3d at 345  (quoting *Raggs* v. *Miss. Power & Light Co.*, 278  F.3d 463, 471 (5th Cir. 2002)).   Nor does a plaintiff need to prove that "her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a *prima facie* case."  *Id.* (quoting Long  v. *Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)).   In fact, the causal link element is "much less stringent" than the "but for" causation standard to be presented to a jury for determination.  *Banks-Jones* v. *Hilton Reservations Worldwide,  LLC*, 2004  WL  190266  (N.D.  Tex. 2004)(quoting *Montemayor* v. *City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001)).

## VI.  INFERENCE OF PRETEXT

86.     Where, as here, the plaintiff makes out a *prima facie* case of discrimination, and retaliation, the defendant must articulate a legitimate non-discriminatory reason for the adverse employment decision.   *See Baker,* 430 F.3d at 754-55.  After the employer does so, "any presumption of [discrimination] drops from the case" and the burden shifts back to the employee to establish that the employer's "stated reason is actually a pretext for [discrimination]."  *Baker*, 430 F.3d at 755 (quoting *Septimus*, 399 F.3d at 610-11).

87.     An employer's failure to follow its own policies or normal practices may be evidence of pretext.  For example, when an employer has a disciplinary system that involves warnings, failure to follow that system may give rise to inferences of pretext. *Goudeau* v. *Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015).

88.     By and through the above arguments, Plaintiff's claims shall survive summary judgment.[3]

## VII.     DAMAGES

89.     The damages under Section 1981 consist of back-pay, front-pay (or reinstatement),

        compensatory damages, punitive damages, attorney's fees, and costs.  Each component is

        explained below.  There is no cap, as there are with Title VII claims.

90.     **BACK PAY**.  Prevailing claimants under the anti-discrimination laws may recover lost

        back-pay and benefits.  *See Miller v. Raytheon Co.*, 716 F.3d 138, 146 (5th Cir. 2013).

        The purpose of back pay is to "make whole the injured party by placing that individual in

        the position he or she would have been in but for the discrimination."  *Sellers v. Delgado*

        *Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

91.     **FRONT PAY**.  "Front pay refers to future lost earnings."  *Wal-Mart Stores v. Davis*, 979

        S.W.2d 30, 45 (Tex. App.–Austin 1998, pet. denied).  Regarding the calculation of front-

        pay, the Fifth Circuit has stated that  "[f]ront pay is . . . calculated from the date of

        judgment to age 70, or the normal retirement age, and should reflect earnings in

        mitigation of damages."  *Patterson*, 90 F.3d at 936 n. 8 (citing J. Hardin Marion, Legal

        and Equitable Remedies Under the Age Discrimination in Employment Act, 45

        MD.L.REV. 298, 330–334 (1986)).  *See also Blum v. Witco Chem. Corp.*, 829 F.2d 367,

        374 (3d Cir. 1987) ("In calculating a front pay award, the jury must consider the expected

        future damages caused by defendant's wrongful conduct from the date of judgment to

        retirement.").

---

[3] *See, e.g., Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n. 10 (5th Cir. 2013) (reversing summary judgment for the employer in a discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original)

92.     **COMPENSATORY DAMAGES**.  Mr. Gazani has suffered future pecuniary losses,

emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and

other non-pecuniary losses, for which he seeks recovery in this lawsuit under Section

1981 and Title VII.  *See, e.g.*, *Salinas v. O'Neill*, 286 F.3d 827, 833 (5th Cir. 2002)

(affirming $150,000.00 compensatory damages award under Section 1981 where the

plaintiff did not receive a position because of his race); 42 U.S.C. § 1981A(a)(1)

(providing for compensatory damages for such harms under Title VII).

93.     **PUNITIVE DAMAGES**.  Defendant acted with malice and reckless indifference to Mr.

Gazani federally protected civil rights, thus justifying awards of punitive damages under

Section 1981 and Title VII.  *See, e.g.*, *Abner v. Kansas City Southern Railroad Co.*, 513

F.3d 154, 164 (5th Cir. 2008) (affirming $125,000.00 punitive damages awards to each

plaintiff under Section 1981, even though each plaintiff was awarded only $1.00 in actual

damages, and strongly suggesting that any punitive damages award up to $300,000.00 per

plaintiff would have been appropriate even in the absence of any actual damages);

*Hampton v. Dillard Dept. Stores*, 18 F. Supp. 2d 1256 (D. Kan. 1998) (awarding the

plaintiff $1,100,000 in punitive damages in a Section 1981 race discrimination case); 42

U.S.C. § 1981A(a)(1) (providing for punitive damages under Title VII when the

discrimination is shown to be with "malice or reckless indifference").  In *Kolstad v.*

*American Dental Ass'n*, 527 U.S. 526, 119 S. Ct. 2118 (1999) the U.S. Supreme Court,

interpreting Title VII, held that to satisfy the "malice or reckless indifference"

requirement, the plaintiff does not have to prove that the violation was egregious or

outrageous.  *Id*. at 535-36.

94.     Rather, all that is required is proof that the employer knew that is was acting in the face of

a perceived risk that its actions were in violations of the law's prohibition against

discrimination.  *Id*.; *see also Schexnayder v. Bonfiglio*, 167 Fed. Appx. 364, 368 (5th Cir. 2006) ("a jury may award punitive damages pursuant to Title VII merely if the employer knew it *may have been* violating the law.") (italics in original).  Finally, unlike Title VII claims, there is **no cap** on the amount of *compensatory* **or** *punitive damages* a successful plaintiff can recover for claims filed under Section 1981.

95.     **ATTORNEY'S FEES**.  Attorneys fees are recoverable to a prevailing plaintiff under Section 1981 and Title VII.  *See Miller*, 716 F.3d at 149 (affirming an award of attorneys' fees of $488,437.08 to the plaintiff in a single-plaintiff discrimination case that arose in Dallas); *Lewallen v. City of Beaumont,* 394 Fed. Appx. 38, 46 (5th Cir. 2010) (affirming an award of attorneys' fees of $428,421.75 to the plaintiff in a single-plaintiff discrimination failure to promote case); *Watkins v. Input/Output, Inc.*, 531 F. Supp. 2d 777, 789 (S.D. Tex. 2007) (awarding prevailing plaintiff in a single-plaintiff discrimination case tried in Houston $336,010.50 in attorneys' fees).

96.     Due to the Defendant's unlawful discrimination, and subsequent retaliation, Mr. Gazani has experienced concrete economic harm in economic damages, as well as emotional distress.

## VIII.  JURY DEMAND

97.     Mr. Gazani demands a trial by jury.

## IX.   NO QUALIFIED STATE IMMUNITY pursuant to
## TEXAS GOVERNMENT CODE Title 5 § 554 *et seq*

98.      Sec. 554.0035.  WAIVER OF IMMUNITY.  A public employee who alleges a violation of this chapter may sue the employing state or local governmental entity for the relief provided by this chapter.  Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter.

## X.   REQUEST FOR AUDIT

99.   Pursuant to Sec. 554.010, Ms. Anderson hereby requests that the City of Waller, and all of its agents, officers, Council members, and representatives in any official capacity, be subject to an audit by the Auditor of the State of Texas. ( See Texas Government Code, Sec. 321.013 )

## XI. PRAYER

100.   Mr. Gazani asks that he be awarded a judgment against PinnacleART, Joe Tankhart in his individual capacity, and Gary Bohm in his individual capacity, for the following:

a.   Actual damages including but not limited to pecuniary losses, non-pecuniary losses, Back-Pay, Front Pay, Compensatory Damages, and, Punitive Damages; in the sum of **$450,000.00**; and,

b.   Prejudgment and post-judgment interest;

c.   Attorney's fees and court costs; and,

d.   All other relief to which Plaintiff is entitled.

Respectfully Submitted,

_____*/s/Julian Frachtman*_____
H. Julian Frachtman
SDTX: 2695031
SBN:   24087536
tel: 832.499.0611
fax: 713.651.0819
Hfrachtmanlaw@gmail.com
3100 Richmond, Ste 203
Houston, Texas 77098

ATTORNEY FOR PLAINTIFF